*622 OPINION OF THE COURT
Simons, J.
This appeal questions whether the voters of New York City may adopt a Charter provision that requires high city officers to forego certain political offices as a qualification for holding public office. Plaintiffs, various City and political party officials, voters and political parties, instituted this action asserting that the provision, section 2604 (b) (15) of the New York City Charter,[1] deprives them of their fundamental rights under the State Constitution, that it does so without compelling justification and that it is, therefore, void. Defendants are the chairman and members of the City’s Conflicts of Interest Board charged with implementing and enforcing the section. After issue was joined, both sides moved for summary judgment. Supreme Court granted plaintiffs’ motion and declared the section void and the matter is now before us on direct appeal pursuant to CPLR 5601 (b) (2). There should be a reversal.
I
During the latter 1980’s corruption was exposed in the New York City government centering on Donald Manes, Borough President and Democratic leader of Queens, and a number of investigations were initiated by Federal and State authorities. Before the investigations concluded, several public and party officials in the City were convicted of criminal activities and sentenced to jail. These disclosures provided the impetus for *623 the appointment by Governor Cuomo and Mayor Koch of a State-City Commission on Integrity in Government charged with the responsibility of assessing the lessons learned from the investigations and recommending reforms. In its report, the Commission called for the revision of the ethical provisions of the City Charter to protect the public against corruption and undue influence of a business or political nature.
At the time, the Charter was undergoing revision as a result of extended litigation in the Federal courts challenging the form of the city government, particularly the makeup and powers of the Board of Estimate (see, Morris v Board of Estimate, 647 F Supp 1463, affd 831 F2d 384, affd 489 US 688). The New York City Charter Revision Commission, appointed for that purpose, also recognized the weakness of the existing provisions governing ethical matters. Accordingly, it decided to recast chapter 68 of the Charter, entitled "Conflicts of Interest”, and submitted to the electorate a package of revisions addressing the issue. Section 2604 (b) (15) was among those the voters approved. Plaintiffs maintain that the section violates several provisions of the State Constitution (NY Const, art II, § 1 [right to vote]; art I, § 1 [right against disfranchisement]; art I, § 11 [equal protection]; art I, § 9 [right of association]; art I, § 8 [freedom of speech]).[2]
n
Plaintiffs contend first that section 2604 (b) (15) denies them equal protection of the law by infringing on various fundamental rights. The threshold determination is whether the challenged provision establishes a classification which burdens those rights. If it does, it must withstand strict scrutiny and is void unless necessary to promote a compelling State interest and narrowly tailored to achieve that purpose (see, Matter of Rosenstock v Scaringe, 40 NY2d 563; Alevy v Downstate Med. *624 Center, 39 NY2d 326, 331-332). If plaintiffs’ fundamental rights are not impaired, then the provision may be sustained if there is a rational basis for its enactment (Maresca v Cuomo, 64 NY2d 242, 250; Matter of Rosenstock v Scaringe, 40 NY2d 563, supra).
A
We reviewed claims similar to those of plaintiffs in Matter of Rosenstock v Scaringe (supra). In that case, plaintiff challenged section 2103 (3) of the Education Law which prohibits more than one member of a family from being a member of the same board of education in any school district. She contended that the provision was an unconstitutional infringement under the Equal Protection Clauses of the Federal and State Constitutions of both her personal right to seek public office and the electorate’s fundamental right to vote. We held that the direct impact of the law was on the right to hold office which was not sufficient to require strict scrutiny of the statute (citing Bullock v Carter, 405 US 134, 142-144). Insofar as the fundamental right to vote was concerned, the statute had only an incidental effect, we said, and did not disfranchise any identifiable class of the electorate. Accordingly, we applied a rational basis test and found the law to be rationally related to the legitimate State interest of insuring that a board of education represent a wide cross section of the community. Plaintiffs maintain that the Rosenstock decision is not applicable to this action because it relates to positions on a school board. No persuasive constitutional basis for distinguishing that office from offices of other municipal corporations is suggested, however, and we find none.
Plaintiffs also rely on several Federal decisions. An analysis of them is appropriate because our State Constitution’s equal protection guarantee is as broad in its coverage as that of the Fourteenth Amendment (see, Under 21 v City of New York, 65 NY2d 344, 360, n 6; Matter of Elser v Walters, 56 NY2d 306, 313-314).
Generally, the Supreme Court has identified two types of ballot access cases which involve fundamental rights and require heightened scrutiny: restrictions based on wealth, which unfairly burden the availability of political opportunity, and restrictions arising from classification schemes that impose special burdens on new or small political parties or independent candidates (see, Clements v Fashing, 457 US 957, *625 964; see generally, Tribe, American Constitutional Law § 13-19 [2d ed 1988]). The two types are illustrated by Bullock v Carter (405 US 134, supra) and Illinois Elections Bd. v Socialist Workers Party (440 US 173).
Bullock v Carter (supra) involved a Texas statute imposing substantial filing fees on potential candidates as a condition to the right to run for local offices. Although the court found that the existence of barriers to a candidate’s access to the ballot "does not of itself compel close scrutiny”, it nonetheless held the filing fee requirement unconstitutional because it was "patently exclusionary [in] character. * * * fall[ing] with unequal weight on voters, as well as candidates, according to their economic status.” (Bullock v Carter, supra, at 143-144.) Inasmuch as the statute had a direct and appreciable impact on the right to vote, the court applied strict scrutiny ánd, finding no compelling State interest for the impositions, ruled that the statute denied Texas citizens equal protection of the laws (see also, Lubin v Panish, 415 US 709).
In Illinois Elections Bd. v Socialist Workers Party (440 US 173, supra), the court struck down provisions of an Illinois law which burdened independent candidates and small political parties running for offices of a political subdivision by requiring them to file petitions with signatures equaling 5% of the number of votes cast in the previous election in that subdivision. The law required only 25,000 signatures for State-wide candidates, however, and therefore produced incongruous results in Chicago where a new party or independent candidate had to obtain substantially more than 25,000 signatures to gain access to the ballot. The court applied strict scrutiny to the law because it burdened the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively (see also, American Party v White, 415 US 767, 780).
By contrast, in Clements v Fashing (457 US 957, supra), the Supreme Court upheld two provisions of the Texas Constitution which restricted a public official’s ability to become a candidate for another public office. A "serve-your-term” provision prohibited officeholders from cutting short their current terms to serve in the State Legislature and a "resign-to-run” rule provided that holders of certain offices automatically resign their positions if they become candidates of any other elected office. The court again refused to classify candidacy as *626 a fundamental right (Clements v Fashing, supra, at 963 [plurality opn]) and held that the challenged provisions neither unfairly burdened the availability of political opportunity nor did they contain any classification that imposed special barriers on minority political parties or independent candidates. Justice Stevens, concurring, found no need to decide whether "strict scrutiny” or "rational basis” was the correct standard because he found that the disparate treatment in the case was not inconsistent with any Federal interest protected by the Equal Protection Clause.
Section 2604 (b) (15) comes within the Clements rationale. It neither imposes a barrier to candidacies based on wealth nor restricts the political opportunity of minorities, minority political parties or independents by means of an impermissible classification scheme. Rather, the section is neutral in its application and the burden it imposes on certain high officeholders does not "depend upon political affiliation or political viewpoint.” (See, Clements v Fashing, supra, at 965.) Moreover, the section has no direct impact on one’s fundamental right to vote and it does not disfranchise any identifiable class of voters (see, Matter of Rosenstock v Scaringe, supra). Its impact on voting rights is, at most, only incidental.
B
Inasmuch as plaintiffs’ fundamental rights have not been sufficiently impaired by section 2604 (b) (15) to require strict scrutiny, the section can be sustained against an equal protection challenge if it is shown to be rationally related to some conceivable and legitimate State interest (Maresca v Cuomo, supra; Matter of Rosenstock v Scaringe, supra; Alevy v Downstate Med. Center, supra, at 332).
Section 2604 (b) (15) is intended to eliminate conflicts of interest that arise when high public officials are simultaneously subject to the demands of both their constituencies and their political parties, to broaden opportunities for political and public participation, to reduce the opportunities for corruption inherent in dual officeholding, and, through all of these methods, to increase citizens’ confidence in the integrity and effectiveness of their government. These are legitimate governmental purposes and have been identified as such both judicially and legislatively. Thus, the courts have upheld laws limiting the partisan political activity of high-ranking city officials (see, Belle v Town Bd., 61 AD2d 352, 358 [forbidding *627 town officers, employees or members of administrative boards from holding certain positions in political parties]) or limiting the political activity of State employees because of the public office they hold (Matter of Purdy v Kreisberg, 47 NY2d 354, 361-362 [rule proscribing police activity in political campaigns]; Boyle v Kirwin, 39 AD2d 993 [forbidding State police from holding public or political office]; Matter of Lecci v Looney, 33 AD2d 916, 917 [police officers prohibited from active politics and from active participation in any movement for the nomination or election of candidates for political or public office], Iv denied 26 NY2d 612).
The Legislature has also recognized the legitimate State interest of such restrictions by enacting Public Officers Law § 73 (9) which forbids certain party officers from serving as "a judge * * * attorney-general or deputy or assistant attorney-general or solicitor general, district attorney or assistant district attorney” (see also, Matter of Burns v Wiltse, 303 NY 319 [dual nomination for candidacy prohibited under County Law]). Indeed, the Legislature has forbidden even former State officers and legislators from engaging in certain activity related to their prior office for two years after their termination (Public Officers Law §73 [8]). As plaintiffs concede, in the absence of an infringement on a fundamental right, such laws are within the Legislature’s "hardly doubted power” (Rapp v Carey, 44 NY2d 157, 160; see also, Forti v New York State Ethics Commn., 75 NY2d 596, 612-613 [declaring Public Officers Law § 73 (8) constitutional on equal protection grounds because the Legislature could rationally conclude that risk of undue influence, or the appearance thereof, resulting from prior State service is significant]). Section 2604 (b) (15) is addressed to these State interests and is rationally related to advancing them. Consequently, it does not violate plaintiffs’ right to equal protection under the State Constitution.
m
Plaintiffs also allege that the City Charter provision, by prohibiting high City officials from holding certain political offices, violates fundamental rights of association and free speech secured to political parties and individuals by the State Constitution (NY Const, art I, §§ 8, 9).
Analysis starts by examining whether the challenged provision significantly burdens rights protected by the State Constitution. If it does, then it may be sustained only if it advances *628 a compelling State interest (see, Eu v San Francisco Democratic Comm., 489 US 214, 222). Plaintiffs have failed to make that inquiry, however, and merely have assumed that section 2604 (b) (15) burdens political speech and associational rights. Finding no compelling State interest for the Charter provision, they contend it is invalid.
In our view, section 2604 (b) (15) does not impair constitutional rights of political parties and, therefore, the City need not demonstrate a compelling necessity for adopting it. Indeed, the section is entirely neutral on issues involving party politics and does no more than prohibit the holding of both high political office and high public office at the same time. It does not deprive political parties or their members of the right to associate with the individuals of their own choosing or the right to identify the people who constitute a political party. Nor does it prohibit political parties from expressing their opinions or selecting their own style of internal organization. The party is free to select a party official as its candidate for any position in City government and may also select a high City official to lead its party but the same person cannot represent the party members in both capacities at the same time. The dissenter contends that the restriction indirectly impairs the associational rights of political parties and that even "indirect restrictions may effect associational freedoms” and constitute a constitutional violation (see, dissenting opn, at 635, quoting Justice Brennan in Elrod v Burns, 427 US 347, 362). The point, however, is that there has been no impairment of plaintiff political parties’ associational rights, either directly or indirectly. Although groups of voters have a constitutional right to advance a candidate to represent their views, this associational right does not require that a particular individual serve as their candidate (see, Tribe, American Constitutional Law, at 1098, n 5 [2d ed]).
In contending otherwise, plaintiffs rely principally upon Tashjian v Republican Party (479 US 208) and Eu v San Francisco Democratic Comm. (supra), cases which differ from the one before us because they involve statutes that dictated how a political party should conduct its internal affairs. Thus, in Tashjian, the Republican Party of Connecticut challenged, on First Amendment grounds, a State election statute which required voters in any party primary to be registered members of that party. The Supreme Court held that the statute, which limited the group of registered voters whom the party could invite to participate in the basic function of selecting *629 the parties’ candidates, deprived the party of its First Amendment right to enter into political association with individuals of its own choosing (Tashjian v Republican Party, supra, at 214-216).
In Eu the Supreme Court invalidated provisions of the California Election Code that prohibited official governing bodies of political parties from endorsing candidates in party primaries. The statute also controlled the size and composition of the State central committees, set forth the rules governing the selection and removal of committee members, set the maximum term of office for the chair of the State central committee and required that the chair rotate between residents of northern and southern California. The court found that this statute burdened the freedom of speech rights of political parties and their members by hindering the ability of the party to spread its message and the ability of voters to inform themselves about the candidates. Moreover, by dictating the organization and composition of the parties’ governing bodies and banning primary endorsements, the law also infringed upon a party’s protected associational right to identify the people who constituted the party and to select a leader who best represented its ideology and preferences.
These authorities are not persuasive because New York City’s Charter provision, unlike the statutes considered in those cases, does not speak to political party matters. It speaks to the qualifications for holding public office and was intended to do no more than prevent conflicts of interest and the possible corruption in City government they may engender by imposing qualifications on certain high City officials. It leaves political parties free to organize and participate in the election process without constraint.
Moreover, the section does not impermissibly burden the fundamental rights of the individual plaintiffs. The Supreme Court decision in Civil Serv. Commn. v Letter Carriers (413 US 548, 565) is dispositive. Although recognizing the extensive impairment of Federal employees’ First Amendment rights by the Hatch Act, the court there upheld its limitations on partisan political activities because they were necessary to insure that the government and its employees not only execute the laws impartially but also appear to the public to be doing so (see also, Broadrick v Oklahoma, 413 US 601). The Supreme Court referred to these decisions in Clements v Fashing (457 US 957, 972, supra) when discussing the First *630 Amendment rights of elected State officials and suggested that even broader restraints would be permissible for elected officeholders, presumably because of their greater powers and responsibilities. Section 2604 (b) (15) is much less restrictive than the statute addressed in the civil servant cases, however, and permits City officials to engage in a broad range of personal or financial activity in support of a candidate or cause. Any de minimis burden the Charter provision imposes on individual rights of expression or association is justified by the important governmental interests underlying it (see, supra, at 626).[3]
IV
Finally, plaintiffs allege that section 2604 (b) (15) of the New York City Chárter constitutes an impermissible delegation of rule-making authority to the Conflicts of Interest Board. The provision authorizes the Board to promulgate rules defining two specific terms, i.e., (1) which enumerated public servants are "charged with substantial policy discretion”, and therefore subject to the section’s prohibition, and (2) the "lesser political officefs]” a member of the City Council may hold.
As we noted in Matter of Levine v Whalen (39 NY2d 510, 515), "[t]he Legislature may constitutionally confer discretion upon an administrative agency only if it limits the field in which that discretion is to operate and provides standards to govern its exercise.” The provisions of the Charter itself make clear that the framers sought to bar public servants with "substantial policy discretion” from certain party offices and to permit persons holding "lesser political offices” than district leader to also serve as City Council members. Section 2600, the preamble to chapter 68, sets forth the guiding purpose of the chapter, stating: "These prohibitions on the conduct of *631 public servants are enacted to preserve the trust placed in the public servants of the city, to promote public confidence in government, to protect the integrity of government decision-making and to enhance government efficiency.” Section 2603 (a), which delegates to the Board the general power to make such rules as are necessary under the chapter, also provides direction by stating that such rules are to be "consistent with the goal of providing clear guidance regarding prohibited conduct.” Taken together, these Charter provisions provide reasonable standards to govern the Board’s action in a limited and specified field for a stated purpose (see, Matter of Consolidated Edison Co. v Department of Envtl. Conservation, 71 NY2d 186, 191; Matter of Levine v Whalen, 39 NY2d 510, 515, supra).
V
In sum, plaintiffs’ challenges must fail. There is simply no basis for plaintiffs’ assertions that a qualification for public office that broadens participation in government by addressing the conflicts and corruption that have resulted from the concentration of power in a few officeholders, somehow restricts associational or expressional freedoms. This conclusion may be reached by an application of common sense and logic, but it is also soundly supported by traditional constitutional analysis. The Charter provision, a result of New York City’s recent sordid experience, and the desire of its electorate to restore public confidence in government, is easily sustainable after that analysis is made.
Accordingly, the judgment of Supreme Court should be reversed, with costs, plaintiffs’ motion for summary judgment denied, defendants’ cross motion for summary judgment granted, and section 2604 (b) (15) of the New York City Charter declared constitutional.

. Section 2604 (b) (15) states:
"Prohibited Conduct
* ** *
"No elected official, deputy mayor, deputy to a citywide or boroughwide elected official, head of any agency, or other public servant who is charged with substantial policy discretion as defined by rule of the board may be a member of the national or state committee of a political party, serve as an assembly district leader of a political party or serve as the chair or as an officer of the county committee or county executive committee of a political party, except that a member of the council may serve as an assembly district leader or hold any lesser political office as defined by rule of the board.”

. Although plaintiffs rest their case solely on State grounds, they have not distinguished the State constitutional provisions from their Federal counterparts nor have they attempted to demonstrate how the State provisions, either singly or in combination, establish any more or greater rights than those guaranteed to the citizens of New York by the Federal Constitution (see, People v P. J. Video, 68 NY2d 296, 301-303; see also, People v Alvarez, 70 NY2d 375, 378-379). They argue only that fundamental rights guaranteed them by the State Constitution have been impaired and seek to persuade the Court that section 2604 (b) (15) cannot survive strict scrutiny. Paradoxically, in doing so plaintiffs deny the applicability of the few available State precedents and rely principally on Federal law.

. The dissent charges the majority, inaccurately, with applying "a standard of review less than strict scrutiny” to test whether section 2604 (b) (15) violates the individual plaintiffs’ speech and associational rights (dissenting opn, at 637; see also, at 634-635, n 5). However, standards of review are applied only to provisions which impair constitutionally protected rights (see, Elrod v Burns, 427 US 347, 362; Eu v San Francisco Democratic Comm., 489 US 214, 222; Tashjian v Republican Party, 479 US 208, 214; Anderson v Celebrezze, 460 US 780, 789). Since there is no significant impairment of plaintiffs’ speech and associational rights in this case, there is no need to engage in an examination of whether section 2604 (b) (15) withstands strict scrutiny analysis (see, dissenting opn, at 632, 641, n 8).